**HORIZON INSURANCE COMPANY,**
Limited, Libelant,

v.

**KINSMAN MARINE TRANSIT COM-
PANY, Respondent.**

No. A 65–1.

United States District Court
N. D. Ohio, E. D.
Sept. 24, 1965.

Robert G. McCreary, Jr., Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, for plaintiff.

Scott H. Elder, Johnson, Branand & Jaeger, Cleveland, Ohio, for defendant.

## RE: RESPONDENT'S EXCEPTIONS TO LIBEL

CONNELL, Chief Judge.

It is alleged that on November 29, 1963 an agent of the Libelant's insured delivered to the Respondent 365,000 bushels of yellow corn to be carried aboard the Respondent's Steamer GEORGE M. STEINBRENNER from the port of South Chicago, Illinois to the port of Buffalo, New York, where it was to be kept aboard the vessel until a grain elevator was available to receive the corn. The transportation and storage of the grain was to be in accordance with the terms of a "Lake Grain Bill of Lading" which included on its reverse side a "Special Contract For Private Storage of Grain And/Or Seed." On January 14, 1964, when the corn was delivered to Libelant's insured, it is alleged by the Libelant that approximately 50,000 bushels of corn had been spoil-

ed by reason of its contact with water. The Libelant has paid its insured $7,540.88 as the estimated damage to the cargo, and has thus succeeded to all the rights, if any, which its insured would have against the Respondent. After unsuccessful settlement negotiations, proctors for Libelant filed this libel for the alleged damage to the cargo of corn.

The Respondent has interposed certain exceptions to the libel, claiming that the averments therein do not indicate that the cause is within the admiralty jurisdiction of the court. Specifically the Respondent argues that an action upon the contract for the storage of grain is not properly cognizable in the admiralty courts. Further, and in the alternative, Respondent claims that the averments of fault in the libel are imprecise and that Rule 22 requires that the Libelant specify the time when and the place where the cargo was damaged by water, and the manner in which the water entered the cargo hold of the vessel.

■ At the outset we dismiss the Respondent's latter contention that the Libelant be required to specify the time, place and manner of alleged damage. Inasmuch as the vessel was continuously in the sole charge of the Respondent's Master, the Libelant was afforded no opportunity to ascertain these details. Therefore the Respondent's latter exception is not well taken.

■ Turning to the main exception of the Respondent, we are required to investigate the permissible limits of maritime jurisdiction over contracts. It is the contention of the Respondent that, the damage having occurred during the period of storage in the harbor of Buffalo, the vessel was in reality a warehouse; it was not engaged in navigation or commerce on the seas; and consequently the breach of contract, if any, was a breach of a common law contract for storage. The averments of the libel are not so narrowly drawn; the libel alleges that the damage occurred some time between the date of loading and the date of unloading. The damage could have occurred while the grain was being transported; no one would seriously argue that such an allegation is not within the admiralty jurisdiction. Therefore, even under the Respondent's theory, the Libelant is entitled to the opportunity to prove that the Respondent failed to provide a seaworthy vessel fit for the purpose of *transporting* the grain, or that those in charge of the vessel failed to use due diligence to keep the cargo safe while it was being transported.

■ Even if the allegations of the libel charged merely a breach of the contract for storage, we think that such an assertion would properly invoke the admiralty jurisdiction of this court. Although the Respondent cites several cases to the effect that a contract for storage of grain in the hold of a vessel which is at rest in port is not a maritime contract, we do not feel that these precedents are compatible with more recent statements of the Supreme Court concerning the scope of admiralty jurisdiction.

The starting place for the criteria of maritime jurisdiction is the pronouncement of Mr. Justice Storey in DeLovio v. Boit, 7 Fed.Cas. 418, 444, No. 3776 (C.C.D.Mass.1815) that the scope of admiralty jurisdiction—

" * * * comprehends all maritime contracts, torts, and injuries. The latter branch is necessarily bounded by locality; the former extends over *all* contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations) which relate to the navigation, business or commerce of the sea." (Emphasis supplied.)

Is it not apparent that the fulfillment of a contract for the storage of grain in the hold of a vessel comprehends a commercial activity which is related to the sea? The Supreme Court's most recent definition of admiralty jurisdiction over contracts is found in Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1960), where the court said:

"The boundaries of admiralty jurisdiction over contracts—as opposed to torts

or crimes—being conceptual rather than spatial, have always been difficult to draw. Precedent and usage are helpful insofar as they exclude or include certain common types of contract: * * * The principle by reference to which the cases are supposed to fall on one side of the line or the other is an exceedingly broad one. 'The only question is whether the transaction relates to ships and vessels, masters and mariners, as the agents of commerce * * *.' 1 Benedict, Admiralty, 131."

Is it not apparent that this transaction relates to ships and vessels?

■ One of the prime considerations used in appraising cases on the border of maritime jurisdiction is the language of the agreement itself. What rights and obligations are created? From what system of law are they derived? As stated by the court in Bulkley v. Naumkeag Steam Cotton Co., 65 U.S. 386, 394, 16 L.Ed. 599 (1860):

"We must look to the substance and good sense of the transaction; to the contract, *as understood and intended by the parties; and as explained by its terms,* and the attending circumstances out of which it arose, and to the grounds and reasons of the rules of law upon the application of which their duties and obligations are to be ascertained."

■ Even a cursory examination of the contract for storage indicates that the parties certainly intended to enter into a maritime contract. The first clause dictates that the "vessel is to be considered as a vessel and not a warehouse throughout the storage period." This is a clear affirmation of the maritime character of the transaction involved. It is further stated that the ship owner is to be considered just that—a ship owner, and not a warehouseman; this is a clear attempt to repudiate the common law obligations of the bailor-bailee relationship in favor of the responsibilities which the law of admiralty places upon a ship owner "to use due diligence to furnish a sea-worthy vessel." The contract is replete with terms uncommon to the common law and familiar only in the semantics of admiralty law. This is a final indication that the parties intended that the contract for storage was a maritime contract; any differences between the parties as to each other's rights and liabilities under that contract should be and will be resolved in admiralty.

Respondent's Exceptions to Libel are overruled.